

**NUMBER 13-14-00029-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**CHRIS DEAN WINDHAM,**                                         **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                         **Appellee.**

---

### On appeal from the 12th District Court
### of Madison County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez, and Justices Perkes and Longoria**
**Memorandum Opinion by Justice Longoria**

A jury found appellant, Chris Dean Windham, guilty of aggravated sexual assault

of a child, and the trial court assessed a prison sentence of twenty years. *See* TEX. PENAL

CODE ANN. § 22.021(a)(1)(B)(i) (West, Westlaw through 2013 3d C.S.) ("Aggravated

Sexual Assault").[1]  By two issues, which are "presented together," appellant argues that he was denied reasonably effective assistance of counsel at trial and that the trial court erred in denying his motion for new trial based on ineffective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("[T]he Court has recognized that the right to counsel is the right to the effective assistance of counsel.") (quotations omitted).  Specifically, appellant asserts that his court-appointed attorney's performance was unreasonably deficient and amounted to ineffective assistance of counsel at trial because counsel (1) "failed to conduct *any* independent investigation of the facts of the case"; (2) "did not have a firm command of the facts"; (3) "affirmatively misunderstood key facts"; (4) failed "to [c]onduct [a] [t]imely [i]nterview of [a]ppellant"; (5) failed to obtain "the assistance of an investigator to conduct interviews"; (6) "repeatedly asserted . . . [the] fundamentally mistaken understanding that there was an adult eyewitness to the offense"; (7) "failed to investigate the information provided by [a]ppellant regarding conduct of the complainant with others"; (8) failed "to obtain a defense expert to discuss the mixture of male DNA [on the child victim's underwear]"; (9) failed "to seek to interview any of the State's witnesses"; (10) "failed to interview the only two witnesses he called at the punishment phase of trial until *after* [a]ppellant was convicted"; (11) "failed to raise potential additional issues concerning the reliability and probative value of the DNA evidence"; (12) failed "to obtain the assistance of an expert to meet the prosecution expert's testimony"; (13) "failed to object to [evidence of] several extraneous offenses"; and (14) "failed to object to opinion evidence about the truthfulness of another witness."

---

[1] This case was transferred to this Court from the Waco Court of Appeals by a docket equalization order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

2

For the reasons set forth below, we conclude that appellant has not established reversible error with respect to his constitutional right to receive reasonably effective assistance of counsel at trial or the trial court's denial of his motion for new trial based on ineffective assistance of counsel. *See* TEX. R. APP. P. 44.2(a); *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009) (noting that "ineffective assistance of counsel may be raised in a motion for new trial") (quotations omitted); *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000) (noting "that a post-conviction writ proceeding, rather than a motion for new trial, is the preferred method for gathering the facts necessary to substantiate [an ineffective assistance of counsel claim]"). Accordingly, we overrule appellant's two issues and affirm the trial court's judgment.

## I. APPLICABLE LAW

"The Sixth Amendment to the United States Constitution, and section ten of Article 1 of the Texas Constitution, guarantee individuals the right to assistance of counsel in a criminal prosecution." *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "The right to counsel requires more than the presence of a lawyer; it necessarily requires the right to effective assistance." *Id.* "However, the right does not provide a right to errorless counsel, but rather to objectively reasonable representation." *Id.*

"To prevail on a claim of ineffective assistance of counsel, an appellant must . . . show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense." *Id.* "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Id.* "The purpose of this two-pronged test is to assess whether counsel's conduct so undermined the proper functioning of the adversarial

3

process that the trial cannot be said to have produced a reliable result." *Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013).

"In order to satisfy the first prong, appellant must prove, by a preponderance of the evidence, that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms." *Lopez*, 343 S.W.3d at 142. "To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different." *Id.*

"An appellate court must make a strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Id.* (quotations omitted). "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id.* "It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Id.* at 142–43 (quoting *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007)). "[Appellant] must produce record evidence sufficient to overcome the presumption that, under the circumstances, the challenged action was sound trial strategy." *Villa*, 417 S.W.3d at 463. "The court will inquire into counsel's trial techniques only when there appears to be no plausible basis in strategy or tactics for counsel's actions." *Id.* "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143. "In making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of

4

each case without the benefit of hindsight." *Id.* "While a single error will not typically result in a finding of ineffective assistance of counsel, an egregious error may satisfy the *Strickland* prongs on its own." *Id.*

"In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal." *Id.* "Allowing this disposition alleviates the unnecessary judicial redundancy and burden on the trial courts of holding additional hearings in writ applications when no additional evidence is necessary to the ultimate disposition of the case." *Id.* "However, this is a difficult hurdle to overcome: the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

The Texas Court of Criminal Appeals "has repeatedly stated that claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Id.* "On direct appeal, the record is usually inadequately developed and cannot adequately reflect the failings of trial counsel for an appellate court to fairly evaluate the merits of such a serious allegation." *Id.* (quotations omitted). "Unlike other claims rejected on direct appeal, claims of ineffective assistance of counsel rejected due to lack of adequate information may be reconsidered on an application for a writ of habeas corpus." *Id.*

## II. STANDARD OF REVIEW

In this case, appellant has called into question more than a dozen aspects of his trial counsel's performance. The alleged deficiencies span everything from counsel's

5

pretrial investigation to counsel's representation of appellant at the sentencing phase of trial. Furthermore, this is one of the rare cases in which the record on direct appeal includes trial counsel's testimony regarding the reasons for many of the decisions that appellant has called into question by his claim of ineffective assistance of counsel. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) ("Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so lacking in tactical or strategic decision[-]making as to overcome the presumption that counsel's conduct was reasonable and professional."). To be sure, appellant has heaped much criticism on his trial counsel, but we need not sift through and second-guess every questionable decision trial counsel made in representing appellant to decide this case based on the second prong of the *Strickland* test, which requires appellant to prove prejudice. *See Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002) (en banc) ("In this case, however, we are concerned only with the second step of the analysis, whether the appellant was prejudiced by his attorney's error."); *Ladd v. State*, 3 S.W.3d 547, 570 (Tex. Crim. App. 1999) (holding that failure to prove the prejudice prong of the *Strickland* test "precludes any relief").

"The question of prejudice turns on the facts that the record shows." *Mitchell*, 68 S.W.3d at 643. Furthermore, to decide the prejudice issue, we are required to review the entire record because "[t]he [*Strickland*] analysis is undertaken in light of the 'totality of the representation' rather than by examining isolated acts or omissions of trial counsel." *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004) (en banc) (quoting *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986)). Accordingly, "we will examine counsel's [entire] performance in appellant's defense" to determine whether the

6

"totality of the representation" caused prejudice to appellant. *Wilkerson*, 726 S.W.2d at 548, 551.

The record shows that the trial court held an evidentiary hearing on appellant's motion for new trial.[2] One of the issues raised at that hearing was whether counsel had effectively represented appellant at trial. Therefore, in addition to summarizing the relevant portions of the trial, a "synopsis of the relevant evidence presented at the hearing [on appellant's motion for new trial] is [also] appropriate." *Id.* at 548. Again, "the focus of [our] appellate review is . . . counsel's conduct in light of the entire record." *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013).

As noted above, the trial court denied appellant's motion for new trial. "An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial court's ruling was clearly erroneous and arbitrary." *Id.*

---

[2] We note that at the hearing on appellant's motion for new trial, the State objected to the timeliness of the motion, which was file marked on October 31, 2013, more than thirty days after September 27, 2013, the date when the trial court imposed sentence in open court. *See* Tex. R. App. P. 21.4 ("Time to File and Amend Motion"). The State failed to get a ruling on its objection from the trial court. *See* Tex. R. App. P. 33.1(a) ("Preservation; How Shown"). Nevertheless, appellant's counsel asked the trial court to take judicial notice that October 27, 2013 was a Sunday. *See* Tex. R. Evid. 201. Citing specifically to Rule 4.1 of the Texas Rules of Appellate Procedure, appellant's counsel also pointed out that "[t]here is nothing that is ever due on a Sunday." *See* Tex. R. App. P. 4.1 ("Computing Time"). In addition, counsel observed that he "also never met an attorney that wasn't aware of the mailbox rule." Citing specifically to Rule 9.2(b) of the Texas Rules of Appellate Procedure, appellant's counsel offered, and the trial court admitted into evidence with "no objection" from the State, a certified mail receipt by the United States Postal Service proving that counsel mailed the motion for new trial to the clerk of the trial court on October 25, 2013. *See* Tex. R. App. P. 9.2(b) ("Filing by Mail"). This is "conclusive proof of the date of mailing." *See* Tex. R. App. P. 9.2(b)(2) ("Proof of Mailing"). Finally, as appellant's counsel pointed out at the hearing, the motion was received by the clerk of the trial court and file marked on October 31, 2013, which was within ten days after the filing deadline. Therefore, as a matter of law, the motion for new trial was "timely filed." *See* Tex. R. App. P. 1.1 (stating that "[t]hese rules govern . . . post-trial procedures in trial courts in criminal cases"); Tex. R. App. P. 9.2(b)(1) ("Timely Filing"); *Taylor v. State*, 424 S.W.3d 39, 45 (Tex. Crim. App. 2014) (applying Rule 9.2(b)'s "mailbox rule" to notice of appeal filed with trial court clerk); *Castillo v. State*, 369 S.W.3d 196, 197–203 (Tex. Crim. App. 2012) (same); *Campbell v. State*, 320 S.W.3d 338, 344 (Tex. Crim. App. 2010) (applying Rule 9.2.(b)'s "mailbox rule" to motion for new trial filed with trial court clerk and holding that "the pleadings of *pro se* inmates shall be deemed filed at the time they are delivered to prison authorities for forwarding to the court clerk").

"A trial court abuses its discretion if no reasonable view of the record could support its ruling." *Id.*

"While the ultimate question of prejudice under *Strickland* is to be reviewed *de novo*, the trial court should be afforded deference on any underlying historical fact determinations." *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005). In other words, "[b]oth the performance and prejudice prongs of the *Strickland* ineffectiveness inquiry are mixed questions of law and fact, but the prejudice prong often contains subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses." *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012) (quotations omitted). "Appellate courts must show almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Id.* "But [ultimately,] the analysis of the prejudice prong turns on whether the deficiency made any difference to the outcome of the case." *Id.* "We must presume that all findings made by the trial judge were made in favor of the prevailing party, and hence, we assume that the trial judge implicitly found that there was no reasonable probability that the result of the proceedings would have been different." *Id.* at 459. Viewing the evidence in accordance with these principles, we agree with the trial court that appellant's ineffective assistance claim must fail.

### III. TRIAL RECORD

On May 3, 2012, a grand jury indicted appellant for aggravated sexual assault of a child as follows:

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

The Grand Jury of MADISON COUNTY, Texas, duly organized at the January, term, A.D. 2012 of the 12th/278th District Court of said County and

8

State, present to said court at said term, that CHRIS DEAN WINDHAM, hereinafter referred to as the defendant, on or about March 2, 2012 and before the presentment of this indictment, in said County and State did then and there intentionally or knowingly cause the penetration of the sexual organ of Jane Doe-pseudonym, a child who was then and there younger than 14 years of age, by defendant's finger.

AGAINST THE PEACE AND DIGNITY OF THE STATE . . . .

Appellant pleaded not guilty to the charge and elected to have a jury decide his guilt or innocence. On June 4, 2012, the trial court appointed an attorney to represent appellant in the trial of this cause.

On July 19, 2012, the State filed its motion for discovery of defense expert witnesses. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (West, Westlaw through 2013 3d C.S.). On July 20, 2012, the State filed its notice pursuant to Article 38.072 of the Texas Code of Criminal Procedure, advising appellant of the State's intent to reserve its right to introduce into evidence the outcry statement that the State summarized as follows: "[Jane Doe,] . . . victim in the above styled and numbered cause, disclosed to Denise Hanson, a person 18 years of age or older and who is not the Defendant, that Chris Windham put his hand in her pants and inserted his finger." *See id.* art. 39.072 (West, Westlaw through 2013 3d C.S.).

On August 6, 2012, the trial court entered an order granting the State's motion and requiring appellant to disclose to the State the name and address of each person he may use as an expert witness at trial. The order stated that the disclosure must be done by October 1, 2012.

On October 23, 2012, the State filed its notice of intention to enhance punishment, which stated in relevant part as follows:

9

It is presented in and to said Court that, prior to the commission of the offense alleged in the indictment in the above captioned and numbered cause, on or about September 29, 2000 the defendant was convicted of Driving While Intoxicated 3rd, a 3rd degree felony in *Cause No. 28,119; State of Texas vs. Chris Dean Windham;* in the 361st District Court of Brazos County, Texas, against the peace and dignity of the State of Texas.

On October 26, 2012, the State filed its extraneous offense notice in which it advised appellant of its intent to reserve its right to introduce into evidence three adjudicated offenses, each for driving while intoxicated ("DWI"), as well as appellant's plea of true to the following violations alleged by the State in its motion to revoke in the third DWI case: (1) failure to report to his supervision officer as directed; (2) failure to pay fines, court costs, restitution, attorney's fees, and other fees; (3) failure to pay supervision fees; (4) failure to successfully complete an alcohol education program; (5) failure to participate in a recommended treatment program; and (6) failure to perform community service hours.

On March 25, 2013, the State filed its second amended witness list identifying fifteen potential witnesses that included, among others, the child victim, an outcry witness, two "CPS Investigator[s]," a forensic analyst, a physician, and a nurse. Also on Mach 25, 2013, the State filed its first amended expert witness list identifying a DNA analyst, a nurse, a physician, and a forensic interviewer as potential expert witnesses.

A jury trial commenced in this cause on April 9, 2013. The first witness the State called to testify was Shena Williams. On direct examination, Williams testified that appellant was her stepfather and that he was residing with her and her mother in March of 2012 because "[h]e didn't have anywhere [else] to go." "At the time . . . [appellant] was living in and out of his truck, just wherever he could crash." There were two other people living in the residence with her at the time: "[t]here was two friends of mine and her two

10

girls -- her two kids." Williams testified that on March 2, 2012, an incident occurred at her

home that caused her great concern. She testified in relevant part as follows:

Q. Can you tell the jury what happened?

A. I had went to bed, because I work night shifts so I sleep during the day. I got up about 7:00 o'clock, normal routine, get up, walk around for a little bit, go get dressed. I didn't notice anybody in the house, didn't hear nothing at first, so I went, got dressed, brushed my teeth, went back into the living room and saw . . . [appellant] and . . . [Jane Doe] on the couch with his head over her stomach, kissing her on her stomach.

Q. Okay. And when you saw that kissing on the stomach, was her shirt up or was her shirt down?

A. Her shirt was up.

Q. And what parts of her body were exposed?

A. The whole top half.

Q. Okay. I need you to be specific.

A. Her chest to where her pants start.

Q. Were her breasts exposed?

A. Yes, sir.

Q. At the time that you saw this, did you actually see him kissing her midsection?

A. Yes, sir.

Q. And we all know that sometimes people play and, you know, I think they call it Zerberting somebody's stomach or something like that. Was this any kind of -- based upon what you viewed, was that the situation where we have an adult playing with a child?

A. No, sir.

Q. What was it more like?

A. It was more of a sexual-kissing thing than it was playing.

11

Q. Okay. And when you see this -- when you saw this happening, what did you do?

A. I yelled "Dad" and he kind of popped up and said "What?" Then my reaction was that I told . . . [Jane Doe] to go outside and told [a second child] . . . to stay in the bedroom, not to come out, and I took her outside. Her mom had just showed up from going to the store and I told her -- I told her, I wasn't mad at her or anything, I just -- I just needed to know what all happened before I had walked in and saw what I saw.

And I told her, I said, "It's okay, baby, because I saw part of it." And she still was pretty shaken up and stuff, and I was pretty livid. I'm not going to lie, I was pretty mad.

Williams then identified appellant in the courtroom and confirmed that he was the individual she saw kissing Jane Doe. Williams testified that appellant was arrested on the evening that the offense occurred and that the child was eleven years of age at that time. She also identified the clothes the child was wearing that night, which were marked and admitted into evidence as State's Exhibit 5–7.

Appellant's trial counsel then cross-examined Williams. Appellant's trial counsel tried to impeach Williams' credibility by asking her about the death of her first stepfather:

Q. Who was your real dad?

A. David Wayne Williams, Jr.

Q. And what happened to him?

A. He left whenever I was three.

Q. Did you have a step dad or a dad that you lost, was killed?

A. Yes, I did.

Q. Who was that?

A. His name was Rick.

Q. Okay. Was that right before Mr. Windham started dating your mother?

12

A. Yes, sir.

Q. Have you ever in your lifetime blamed what happened to Mr. Williams on the fact that your mother started dating Chris Windham?

A. No, sir.

Q. So it's your testimony that you've never had hard feelings about Mr. Windham because you felt like your mother murdered your dad because of her relationship with Chris Windham?

A. No, sir.

Williams then clarified that her mother had, in fact, killed Rick Wallace, her first stepfather. Appellant's trial counsel continued his cross-examination, attempting to establish that Williams was biased against appellant because she blamed him for the death of her first stepfather and for the role her mother played in the death:

Q. And how old were you when he got killed?

A. I was eight.

Q. Okay. And was your mother beginning to date Mr. Windham about the time that there was -- that your mother was accused of killing your step dad?

A. He was dating her before she actually went and turned herself in.

Q. Say what?

A. He was dating her before she went and turned herself in.

Q. Did you ever have a problem or think he had anything to do with her turning herself in or getting picked up?

A. No, sir.

Q. You've never accused him of being the fault for her getting arrested for the murder of your step father?

A. No, sir.

13

Appellant's trial counsel then attempted to impeach the credibility of Williams' testimony on other grounds involving a purported disagreement that Williams and appellant had over Williams driving appellant's motor vehicle, a pickup truck. However, Williams denied having any disagreement with appellant. She explained that they "had traded vehicles." Then, she testified that she hid the vehicle from appellant after he got out of jail. She testified that unspecified "officers," ostensibly, police officers, called her and said she "needed to give the truck back" and that she complied.

Appellant's trial counsel then attempted to impeach the credibility of Williams' testimony on other grounds involving an incident in which she had appellant arrested for violating the terms of a protective order. This happened after the date of the offense at issue in this case and after appellant had been released from jail.

The State then called J.R., the mother of Jane Doe, as its next witness. Initially, on direct examination, J.R. testified about an extraneous offense appellant committed against Jane Doe:

Q. And back in March of 2012, how old was . . . [Jane Doe]?

A. She was 11.

Q. All right. Back on March 2nd, 2012, was there an -- did you learn of an incident that had occurred at your residence?

A. Yes.

Q. Concerning your daughter?

A. Yes.

Q. Were you present when it -- when it occurred?

A. I seen it. I was not right there when -- like right there besides her.

Q. Okay.

14

A. But I was in the doorway.

Q. What time of the day are we talking about here?

A. It was -- it was still daylight, maybe about 4:00 or 5:00.

At this point, the State's attorney asked to approach the bench, and the following exchange occurred at the bench:

| | |
|---|---|
| [State's attorney]: | Judge, I'm afraid there was another incident, not the one that's charged in this indictment -- there was another incident that happened before this one, and I think that she's trying to talk about that incident, and I don't want that to happen because it's -- I mean there's been no notice of it or anything like that that came up during our discussion. And so, what I'd like is an opportunity to tell her that we're not here to talk about that incident. We're here to talk about the incident -- |
| THE COURT: | Do you want me to remove the jury? |
| [State's attorney]: | That would be a good idea. |
| THE COURT: | Okay. |

The trial court then directed the jury to the jury room. Outside the presence of the jury, the State continued to examine J.R. and confirmed that she was "talking about . . . what we call an extraneous offense." The State told J.R. "don't talk about that," and she agreed not to. The jury was then brought back into the courtroom, and the State continued its direct examination of J.R.

On further direct examination, J.R. testified that appellant had been living in the same residence with Williams when J.R. and her two minor children moved into the home, which "was a single-wide trailer." J.R. testified that she and her children had been living there for "[m]aybe a week or two" when "[t]here was an incident [concerning her daughter, Jane Doe,] that occurred at . . . [the] house . . . on March 2nd, 2012 . . . [which she]

15

learned about after the fact." J.R. testified that before the incident occurred, she was on the couch with appellant and Jane Doe. According to J.R.'s testimony, at some point in time, she left them there to go with her friend Terry to get a pizza. Terry was also residing at the home. When J.R. and Terry left, appellant and Jane Doe were still on the couch. J.R.'s "son was in the bedroom and . . . [Williams] was in the bedroom getting dressed to go to work." J.R. testified that it was appellant's idea that they go get a pizza and that he paid for it. He did not go with them "[b]ecause he was drinking." They were gone "[a]bout an hour."

On direct examination, J.R. confirmed that State's Exhibits 5–7 were the clothes Jane Doe was wearing on March 2, 2012. She also confirmed that she "did not see anything that happened that evening." She further testified that Jane Doe has a learning disability and that she functions "mentally" like she is "[a]bout a seven" year old child. The disability "interferes with her ability to communicate."

On cross-examination by appellant's trial counsel, J.R. clarified that she and her two children "had just gotten there" and had been staying with Williams "[m]aybe a couple of days" before the incident occurred on March 2, 2012. J.R. testified that she and her daughter would sleep in Williams' room when she went to work. The children's clothes were in the other bedroom, where appellant slept. She confirmed that "at times they would use . . . [appellant's] room to sleep." Appellant's trial counsel then asked: "[S]o there's a possibility . . . [appellant] could have come into contact with some of their clothes by moving them out of the way in his room?" J.R. replied, "No, sir." She explained that the clothes were kept in small bags. However, counsel persisted in this line of questioning, and ultimately, he succeeded in getting J.R. to admit that the "kids' stuff" was

16

"laying on . . . [appellant's] bed" and "laying on whatever else he had in the room there." They "weren't changing the sheets out every time . . . ." "[T]hey were kind of all living in the same area, just at different times . . . ."

Continuing his cross-examination of J.R., appellant's trial counsel shifted his focus to the date of the offense. Counsel asked J.R. how far she and Terry had to travel to get the pizza, and J.R. testified, "It might have been 20 minutes away." Then, counsel clarified, "I'm talking about in a car, not walking," and J.R. testified, "Oh, maybe five minutes." J.R. estimated that the distance from the trailer house to the store was "[m]aybe [the length of] a football field." They were driving, not walking, on the date of the offense, and it took "[m]aybe five minutes after the pizza was done" for them to return to the trailer house.

At this point, counsel segued into the topic of the discord that purportedly existed between appellant and Williams regarding their vehicles, which counsel had previously raised in his cross-examination of Williams:

Q. What were you driving?

A. A little black car.

Q. Who did that belong to?

A. It was [Williams' car] . . . .

Q. In the day or so before this incident, had there been a disagreement between . . . [appellant] and . . . [Williams] and was she forbidden to drive his truck?

A. I don't know.

Q. She wasn't driving his truck in the days before this incident, correct?

A. No.

17

Q. Do you remember how long it had been since he had allowed her to use the truck?

A. I don't remember.

Q. Okay. Do you recall the two or three days you were there that she was forbidden from using his truck?

A. No.

Q. Did you observe any arguing about her using his truck in the two or three days you were there?

A. No, sir.

Q. Did you observe any contention between the two of them? Do you know what that means?

A. No, sir.

Q. Problems, them seem like they weren't getting along?

A. She would talk to him.

Appellant's trial counsel then shifted the focus of his cross-examination to J.R.'s account of the events that occurred on or about March 2, 2012 before returning to the issue of the discord between Williams and appellant:

Q. Was Mr. Windham asleep when you left?

A. No.

Q. Was he sitting there watching TV or what?

A. Yes.

Q. And when you got back home, [Williams] . . . had you out in the front yard?

A. Yes, sir.

Q. How long was it after that that the cops were called?

A. Not very long.

18

Q. Did you notice that right after all this happened, . . . [Williams] went back to driving Mr. Windham's truck?

A. Yes, sir.

Q. Was there any joking about, "He's gone, I'll take his truck now"?

A. No, sir.

Q. Were you still around when the cops had to be called to locate the truck when she wouldn't give it back to him?

A. No, sir.

Q. How long did you stay there after that?

A. I didn't stay no more after what happened with my daughter.

Q. Okay.  You left?

A. Yes, sir.

Q. Were you ever made aware of the fact that the police had to get involved because she was exercising ownership of his truck and wouldn't give it back?

A. No, sir.

Finally, counsel concluded his cross-examination of J.R. by asking her whether she had ever observed "the kids wrestling or playing with . . . [appellant] or tickling . . . [appellant] or him joking with one another."  J.R. testified that appellant "would play around with them."  She also testified that she saw them "[j]ust playing around and just poking at each other," which she thought was "harmless."

Next, the State called twelve-year-old Jane Doe to testify.  On direct examination, she identified appellant by name and appearance in the courtroom and stated that he is "the same guy that was living in the house with . . . [her]" in March of 2012.  The State's attorney asked Jane Doe if she recalled "a day when y'all were sitting around, watching

19

TV," and Jane Doe answered affirmatively. She remembered that they were watching the movie *The Eclipse* from the *Twilight* series—"that vampire stuff." She was sitting by herself, watching it alone. Her mother was talking to Williams. Then, appellant "sat there and just started watching TV with . . . [her]." The State's attorney elicited the following testimony:

Q. All right. Okay. Now, you were sitting on the couch watching Twilight, and did -- Mr. Chris over here, did he do anything unusual to you that day?

A. Yes.

Q. What happened?

A. He touched here and here.

Q. When you say "here and here," are you pointing here?

A. Yes.

Q. What are these called?

A. Boobies.

Q. Okay. What's this called?

A. Privates.

Q. Okay. Were you wearing clothes that day?

A. Yes.

Q. And see this stuff laying up here on the table over here? Do you see this?

A. Yes.

Q. What's that?

A. My shirt.

Q. What's this?

20

A. Shorts.

Q. All right. Were those the clothes you were wearing that day?

A. Yes.

Q. Did you have your underwear on that day?

A. Yes.

Q. Is that the underwear you were wearing that day?

A. Yes.

Q. All right. And you were sitting there and you said he touched you on your boobies and he touched you on your privates. Okay. Now, in your private area you've got two spots. There's a spot you go TT and a spot you go poo-poo. Right?

A. Yes.

Q. Okay. Did he touch you at the spot where you go poo-poo or touch you in the spot where you go TT?

A. TT.

Q. All right. And what did he touch you with?

A. His hand.

Q. Okay. Now, when you were sitting on that couch that day, did you have these clothes on?

A. Yes.

Q. Okay. When he touched you, did he touch you here above the clothes or did he go under the clothes?

A. Under.

Q. Okay. And what did he touch you with?

A. His hand.

Q. Okay. And when he -- when he touched you down here in your private parts, did he touch you on top of your clothes or underneath your clothes?

21

A. Under.

Q. Okay. And what did he touch you with?

A. His hand.

Q. All right. Now, this is going to get a little bit tricky, but you've got to tell us what happened. Okay. He stuck his hand down there. Okay. Did anything go inside of your body?

A. Yes.

Q. What?

A. His fingers.

Q. Okay. And was it one finger or two fingers?

A. One.

Q. Did it hurt?

A. Yes.

Q. Did it hurt bad?

A. Yes.

Q. After this was over, did it hurt for a few days after that?

A. Yes.

Q. Did it hurt when you went TT?

A. Yes.

. . . .

Q. After that happened and you were on the couch, did he also -- was there also a time that he raised your shirt?

A. Yes.

Q. And what was he doing then?

22

A. He was touching my booby.

Q. Okay. Did he ever do anything with his mouth on you?

A. Yes.

Q. Okay. What did he do?

A. He kissed my stomach.

Q. All right. And was your shirt pulled up when he was doing it?

A. Up.

Q. It was pulled up?

A. (Witness nods head.)

Q. Is that a "yes"?

A. Yes.

Q. All right. And was there anybody else in the room while this was going on?

A. No.

Q. All right. What made him stop?

A. [Williams] . . . .

Q. What did she do?

A. She yelled at him.

Q. Did he -- where was she at?

A. She was coming out of her back bedroom.

Q. Okay. And she yelled at him and what did he do?

A. He stopped.

Q. Okay. Then what happened to you?

A. She made me go outside and tell my momma.

23

Q. Okay. Was there anybody else over there?

A. Yeah. She called her momma and she called the cops.

Q. Do you know what her momma's name is?

A. Uh-huh.

Q. Okay. But do you remember talking to . . . [Williams'] momma?

A. Yes.

Q. Did you tell her everything that happened?

A. Yes.

Q. Did you tell her that he touched you between your legs?

A. Yes.

Q. Did you tell her that he stuck his finger inside of you?

A. Yes.

Appellant's trial counsel then cross-examined Jane Doe. Counsel asked Jane Doe to identify the first person she disclosed the incident to, and she said it was Williams. She said that they went outside to talk about what had happened on the couch. Then, Williams' mother showed up later. Counsel also asked Jane Doe if she had been staying in the same room with appellant, and she said no. She testified that she was not certain about how many days they had been staying in the trailer prior to March 2, 2012. Counsel concluded his cross-examination. The State had no further questions, and Jane Doe was excused.

Next, the State called Billy Harris to testify. Harris was formerly employed as a patrol deputy with the Madison County Sheriff's Department. Harris testified that he responded to a call on March 2, 2012 in which he encountered Williams, Williams' mother,

24

J.R., and Jane Doe standing outside the trailer home. Harris identified these individuals, and he subsequently assigned the pseudonym "Jane Doe" to the child victim for purposes of his offense report. He interviewed everyone. He obtained from Williams the clothing marked as State's Exhibits 5–7, which had been previously identified by other witnesses as the clothes that Jane Doe was wearing on March 2, 2012. Harris confirmed that State's Exhibits 5–7 were the same articles of clothing that he collected from Williams. The State's attorney showed Harris a bag that had been marked as State's Exhibit 4, and Harris confirmed that it was the same bag that he placed the clothing into. Over appellant's chain of custody objection, the trial court admitted State's Exhibit 4 into evidence.

On cross-examination by appellant's trial counsel, Harris testified that he collected the clothing marked and admitted as State's Exhibits 5–7 the day after he was "called out to the house." He "was called out on a Saturday night . . . received those clothes on Sunday, the following day[,] . . . probably around 24 [hours later]." Counsel then asked Harris why State's Exhibit 4, the bag in which the clothing was stored, had written on it "2-5-12 at 12:03." Harris admitted, "That was an error on my part." Counsel then elicited the following testimony from Harris:

Q. Okay. So it should be 3-5?

A. Yes, sir.

Q. So it's not the next day, it's two days later?

A. Well, it would have just been after midnight, so the offense that occurred the night before, during the nighttime hours, so a little -- maybe a little more than 24, but just roughly around there.

Q. So you can't tell this Court who was in contact with that clothing or how many people came in contact --

25

A. No, sir.

Q. -- with that clothing before it was delivered to you on March the 5th?

A. No, sir, I cannot.

Q. And how was it presented to you?

A. Ms. Williams presented them to me in a plastic bag.

Q. All together in one bag?

A. All together in one bag, yes, sir.

Q. Do you know whether those different areas -- or items were allowed to contaminate each other by touching each other with one bag?

A. When I collected them, I bagged them and put them in evidence exactly like I collected them from them. They were all in the same bag, yes, sir.

Q. Would you agree that it's much wiser to put stuff, items of clothing in separate bags?

A. It is if I collect it from the scene, yes, sir.

Q. So before you got it, this stuff was contaminated and was able to be with other items of clothing, all in the same bag and laying on top of each other?

[State's attorney]: Judge, I'm going to -- I'm going to object to the question that it was contaminated. I don't know if he has personal knowledge of whether it was contaminated or not.

THE COURT: That's sustained.

Q. But all these items of clothing were inside the same bag and allowed to touch each other?

A. Yes, sir.

Q. And if you could -- if you could have determined how to do it or a proper way of doing it, you wouldn't have done it like that?

A. No, sir.

Q. How would you have done it?

26

A. My intent and actually what I wanted to do was to go to the -- actually, the initial intent was to have the hospital collect it, which that is what is generally done during an examination of a victim. They did not. So, as soon as we became aware of it, I called to request to go to the house where they had been removed from the victim to collect them. I was not given the clothes at the house, though. She thought she was doing the right thing by bringing them to me.

Q. So you don't know how many people touched this clothing at this house in North Zulch, correct?

A. I do not know.

After appellant's trial counsel concluded his cross-examination of Harris, the trial was recessed for the day. When the case was resumed the following day, and outside the presence of the jury, the State indicated that it intended to call Williams' mother, Denise Hanson, as its next witness, and appellant's trial counsel immediately objected to "Ms. Hanson going into any, quote, outcry witness testimony." Appellant's trial counsel told the trial court, "she is listed as the outcry witness and I specifically asked the victim . . . yesterday, who was the first person she told about this sexual contact and she said that it was . . . Williams. And I believe the record is clear to that . . . ." Counsel then elaborated on his objection as follows:

I believe under the provisions of the Texas Criminal [Procedure] Code, Article 38, that the law clearly states that the first person the victim talks to is the outcry and the victim herself has already testified to the Court that the first person she told about the sexual contact of touching her is . . . Williams, the daughter of Ms. Hanson, not Ms. Hanson.

The State's attorney then responded as follows:

Well, I think the question that was asked at the end of the day was something along the lines of, who's the first person you told, and I believe she did indicate that it was . . . [Williams]. It's our contention that the first person she told about that she was touched on her breast, her stomach area, was . . . [Williams]; but the first person that she told about the actual

penetration was Ms. Hanson. And that when the little girl out cried to Ms. Williams, she immediately called her mother to come over there.

Ms. Williams was very frantic and upset, her mother took the child over to the side and began to talk to her, and that's when the first indication that a finger was placed inside of her vagina was done to Ms. Hanson at that point in time; the other outcry was about the touching on her stomach and kissing and things of that nature. So I think we have separate outcry witnesses for two separate events.

Appellant's trial counsel then responded to the State's argument as follows:

Judge, my response is that the information that I received led me to believe that what happened was they told the girl to go outside, she went outside, Shena Williams went outside, she asked her what had been going, she said what else has he done to you. At that point she testified that she told her that he placed his finger inside of her. She then calls her mother to come because she realizes she's got a situation on her hands and wants her mother's advice.

And I believe that the law is clear that the first person that -- even if it's a weak outcry or not is in great detail, there is cases that say that the very first person that they talk to is and can only be considered as the outcry and the person that comes in and gets it afterwards. And I think the reason she called her mother was because she knew that she had been told to the degree that there had been more than just kissing on the belly, there had been touching in her private part. And so, that's my objection.

And to me, it's just piling on and it's not the intent of the rule. The victim has already testified and made testimony, given testimony about what happened and I clearly knew this was going to be an issue and that's why I specifically asked her, who was the first person you told about this touching you in your private parts or any places you shouldn't be touched.

The trial court ruled as follows: "Well, it sounds to me like you need to get Ms. Williams up here to make a record to find out which one is the outcry witness." Thereafter, Williams was re-called to testify outside the presence of the jury. The State elicited the following testimony from Williams on direct examination:

Q. But back on the day -- I want to take you back to the day this incident occurred. After you observed what was going on and you had a chance to take . . . [Jane Doe] out of the house, okay --

28

A. Uh-huh.

Q. -- on that day, did . . . [Jane Doe] make statements to you about what happened that day, on that day?

A. She wouldn't really talk to me. She was more able to talk to my mom.

Q. Okay. Did she -- did she say anything at all about what happened?

A. Not to me.

Q. Okay. So she did not make a statement to you that he touched her breast?

A. No, she didn't, no, sir.

Q. Did she make a statement to you that he put his hands down her pants?

A. No, sir.

Q. Did he (sic) make a statement to you that he inserted a finger in her vagina?

A. (Witness shakes head.)

THE COURT: You need to answer out [loud], ma'am, rather than shake your head. All right?

A. No, sir.

Q. Now, I realize you might have learned about that later on or something like that, but on the day this happened, did she tell any of those type of statements?

A. No, sir, she didn't.

On cross-examination, appellant's trial counsel questioned Williams about whether anyone had told her the reason she was needed back in court, and Williams said, "Nobody gave me a reason, they just said I was needed." Counsel then proceeded to elicit the following testimony from Williams on further cross-examination:

Q. Okay. Did you -- did you visit with . . . [Jane Doe] outside of the house after this alleged incident took place?

29

A. Did I sit out there with her?

Q. Did you talk to her outside?

A. Yes, sir.

Q. Okay. What did you talk about?

A. I just asked her if he had done anything and she wouldn't tell me anything.

Q. Okay. If she has testified that she told you what had happened, is she telling the truth or lying?

A. She didn't tell me anything about him penetrating.

Q. If she has testified that she told you the specifics of what went on inside on the couch and to the extent of what went on, is she telling the truth or telling a lie?

A. She told me what happened on the couch, but nothing further.

Q. Okay. So what did she tell you happened on the couch?

A. What -- exactly what I saw, that he was kissing her on her stomach.

Q. Okay. What else?

A. That was pretty much all that she said.

Q. Okay. Did you ask her: Did anything else happen?

A. Yes, sir.

Q. And what did she say?

A. She just wouldn't say anything.

Q. Okay. Do you remember giving different statements than that to CPS?

A. No, I don't even remember talking to CPS.

Q. You don't remember telling CPS, when you were interviewed from CPS, that she told you that there had been a touching of her inside of her shorts by Mr. Windham's finger?

30

A. No, I didn't say she was the one that told me.

Q. Okay. So you don't recall telling CPS that that's what . . . [Jane Doe] told you?

A. No, I don't.

Q. So you would disagree if . . . [Jane Doe] had stated that she told you exactly what had happened on the couch to the full extent of everything she recalled happening?

A. Of everything that I saw? She did tell me whatever I saw, but nothing further than that.

That concluded Williams' testimony, and the trial court excused her. At that point, appellant's trial counsel renewed his objection to Hanson's testimony as an outcry witness:

[I object under article] 38.072 with regard to outcry testimony by Denise Hanson, because of the statements of the child that the first person that she told, on her cross-examination, was Shena Williams. And I believe higher credibility should be given to the child in this matter than Ms. Williams's testimony and lodge my hearsay objection to any outcry testimony by Denise Hanson or anybody else in this matter.

The trial court overruled the objection, and the State called Denise Hanson to testify. On direct examination, Hanson testified in relevant part as follows:

Q. All right. And did you have a discussion with . . . [Jane Doe] that day about what had happened in the house?

A. Yes, sir.

Q. And what did she indicate to you?

A. Said that her mother has gone to the store to get them pizza and that Mr. Windham called her to the couch and touched her breast above her clothes and under her clothes and then raised her shirt up, was kissing her on the stomach and stuck his hand down in her panties and inserted his finger into her vagina.

Q. Okay. Now, I'm sure she probably didn't use those exact words --

A. No.

Q. -- like vagina and all that stuff, correct?

A. No.

Q. Okay.

A. She said her female parts.

Q. Okay. And she had indicated to you that day that his finger, Mr. Windham's finger, went into her vagina?

A. Yes, sir.

Q. In kid's language?

A. Yes.

On cross-examination, appellant's trial counsel asked Hanson to confirm that she is not Williams' biological mother, which she did. In response to counsel's cross-examination, Hanson also disclosed that Williams' biological mother is presently incarcerated. Finally, counsel elicited testimony from Hanson regarding the fact that Hanson currently has custody of Williams' three children.

Next, the State called Joe Franklin, M.D. to testify. On direct examination, the State elicited the following testimony from Dr. Franklin:

Q. Back in March of 2012, did you have an occasion to evaluate a child by the name of [Jane Doe]?

A. Yes, sir.

Q. And do you recall the age of that child?

A. Eleven, without looking at the report, but if I remember, she is 11 years of age.

Q. Okay. And do you know why she came to the emergency room that date?

32

A. The initial complaint to the triage nurse was that a known -- a person known to her had put his finger in her vagina on two different occasions, the day before and that day that she came to our department.[3]

Q. Okay.

A. And then she repeated the same in my investigation.

Q. Okay. And when these allegations were made, did you have an occasion to do an exam on her?

A. Yes, sir. With that age group, we did an external exam only. It's considered appropriate, the standard of care with a certain pediatric population, do the external exam and then refer the internal exam to Scotty's House, a local resource at Bryan/College Station that specializes in those exams.

. . . .

Q. Okay. And when you did the external exam, did you note any type of injury or anything?

A. No external trauma was noted and that's consistent with her story. A digital manipulation with a finger that would -- no one would expect to cause physical signs of trauma.

Appellant's trial counsel did not cross-examine Dr. Franklin.

Next, the State called Shannon Hernandez to testify. On direct examination by the State, Hernandez testified that she is "the director of programs over at Scotty's House," which "is a child advocacy center" where they "do the forensic interviews, forensic medical exams and provide counseling to families." The State then attempted to elicit testimony from Hernandez regarding an interview she conducted of Jane Doe on March 13, 2012 and whether Jane Doe made "any type of outcry regarding sexual assault" during the interview; however, appellant's trial counsel objected that the question called for hearsay. At the bench and outside the hearing of the jury, the trial court asked, "Is this going to be

---

[3] We note that on appeal, appellant maintains that his trial counsel's performance was deficient because he failed to object to this testimony as hearsay.

33

anything new as far as outcry is concerned or is this just what she told her about the incident?" The State's attorney answered, "Just what she told her about the incident." The trial court then sustained the hearsay objection. After that, the State sought to offer into evidence an audio and video recording of the interview, but appellant's trial counsel made the same objection, which the trial court sustained. The State concluded its direct examination of Hernandez with the following exchange:

Q. As part of your interview process, do y'all often ask them to maybe repeat something you've already asked?

A. I'm not sure what you mean.

Q. Well, I guess what I'm trying to find out, you're there to basically try to determine if they're credible for telling the truth, things of that nature?

[Appellant's counsel]: Objection, leading.

THE COURT: That's overruled.

A. There is indicators we look for, you know, that we have been trained on that may indicate that they may not be truthful or -- and that kind of thing. We do sometimes repeat questions. Like I said, we instruct them at the beginning, if we've already asked them that, to let us know. I usually tell them to give me the same answer just because I forgot. But sometimes we need to go back and clarify something they said.[4]

At this point, the State passed the witness. Appellant's trial counsel stated that he had no questions, and the witness was excused.

Next, the State called Larry Steve Shiver to testify. On direct examination by the State, Shiver testified that he is an investigator for the Madison County Sheriff's Department and that he participated in the investigation of this case by "doing the buccal swab on the suspect [i.e., appellant] and sending the evidence off to the lab . . . ." Shiver

---

[4] We note that on appeal, appellant asserts that his trial counsel's performance was deficient because he did not object to this testimony on the basis that it was "opinion evidence about the truthfulness of another witness."

34

explained that a "buccal swab" is "basically a noninvasive DNA sampling[,] . . . [which is taken] from the cheek area." The State offered into evidence State's Exhibit 13, which Shiver identified as "an air-dry box with the swabs from . . . [appellant's] left and right cheek that we sent to the laboratory." Appellant's trial counsel objected that he had not been supplied this evidence in pretrial discovery. The State's attorney responded, "[T]he box was delivered to our office on Monday, yesterday, before trial. I opened the box and in the presence of [appellant's trial counsel]. It's the first time I've ever seen it, the first time he has ever seen it." The trial court asked, "[I]s there a lab report?" And the State's attorney responded, "Yes. And he's been provided with that on that day even earlier than the opening of the box." Appellant's trial counsel agreed that this was a true statement. The trial court then overruled his objection, and State's Exhibit 13 was admitted into evidence.

Upon further direct examination by the State, Shiver testified that the buccal swabs taken from appellant were subsequently sent to the University of North Texas Center for Human Identification along "with a bag with some clothing in it, which was placed in another paper bag." Shiver then identified State's Exhibit 4 as the bag that contained the clothes that he sent to the laboratory. Shiver testified that he received the bag from Harris and that he sent the items to the laboratory asking "for DNA sample and comparison of the two items."

Appellant's trial counsel then cross-examined Shiver, focusing on the subject of "cross-contamination." Appellant's trial counsel elicited the following testimony from Shiver:

> Q. Deputy Shiver, do you know why the air box is designed for keeping the swabs from being in contact with anything?

35

A. Yes, sir, they're there to prevent cross-contamination.

Q. What is cross-contamination?

A. Where another object impedes on your sample and basically contaminates the object.

Q. What are some of the examples of other items that can contaminate a sample?

A. Aerosols, somebody else's hand, the list is endless, anything in the environment, actually.

Q. Okay. Contact with substances that might have DNA on them?

A. Yes, sir.

Q. Okay. What -- is there endless the number of different ways you can get contamination?

A. Yes, sir.

Q. Is it pretty easy to cross-contaminate a DNA sample?

A. It's not that difficult.

Appellant's trial counsel then focused on the clothing samples belonging to the victim:

Q. Isn't it true that any kind of contact with any source can cause cross-contaminate?

A. Yes, sir.

Q. Were you aware that the clothes that were provided there in this grocery sack right here were all provided in one container?

A. Yes, sir.

Q. Is that the proper way to transfer those type of potential samples?

A. Normally, those samples are taken at the hospital in a bag, individually.

36

Q. Would you agree that the proper procedure would be, No. 1, to get them bagged as soon as possible, correct?

A. Yes, sir.

Q. Make sure they're bagged where they can't have any contact with the other, correct?

A. Correct.

Q. And if they do come into contact with each other, that's cross-contamination?

A. It possibly could be ruled so, yes, sir.

Q. And you know that these clothes, for two days after this alleged event, were laying around with other clothes apparently at a house somewhere in North Zulch?

A. From what I read in the report, yes.

Q. Then they were transferred to several different locations and eventually at one of the nursing homes picked up by, I think, Deputy Harris?

A. Yes, sir. I do know that the person who picked up the clothing was wearing gloves, but I don't know where the gloves came from.

Thereafter, appellant's trial counsel focused his cross-examination of Shiver on the possibility of cross-contamination by the gloves Williams used to collect the articles of clothing from the child victim:

Q. Let's talk about those gloves. A normal set of rubber gloves that you buy from -- maybe at the drugstore or at Brookshire's pharmacy or Wal-Mart pharmacy, those don't get it, do they? Those are not the proper type of gloves, are they?

A. No, sir.

Q. And why is that?

A. Because the impurities that were -- actually prevail in the system where they're made, where they're laid at, where they're stored, where they're kept.

37

Q. Isn't it for DNA purposes required that the gloves also be sterile?

A. Yes, sir, and powder free.

Q. And when you get those gloves, you have to take them out of a separate package?

A. Yes, sir.

. . . .

Q. If it's just the normal way of buying rubber gloves, a bunch in one box, not individually wrapped and packaged, those can be contaminated?

A. If they're brand-new, possibly not but it's hard to say for me.  I'm not an expert on the gloves but probably not.

Q. In the operating room, they don't use those kind of gloves, do they?

A. No, sir.

Q. What do they -- what type of gloves do they use?

A. They usually use the nitrite, which are basically powder-free, sterile gloves.

Q. And individually wrapped?

A. Yes, sir.

. . . .

Q. And it's sure not an ideal situation to have stuff in the way of potential evidence mingling with other things or laying around with other samples of clothing, or sheets, bedspreads that could be in contact with a number of people, correct?

A. Probably not a good idea to do it that way.

Trial was then recessed for the day, and the jury was excused.

The next day, the State called its final witness:  Farah Plopper.  On direct examination by the State, Plopper testified that she is a forensic DNA analyst at the

University of North Texas Center for Human Identification in Fort Worth and testified

regarding the general subject of DNA as follows:

> DNA stands for deoxyribonucleic acid and it's basically our genetic blueprint, it's everything -- it's responsible for everything that we are and how we look and almost all of our DNA is the same between us and that's what makes all of us human; but there are areas on the DNA that differ and those are what are useful in forensic testing.

> Also, since DNA is found in practically every cell of our body, we can get DNA from any biological material. We can get DNA from blood, from sweat, saliva, hair, bone, it's all going to be the same DNA as long as it's from the same person and only identical twins are going to have the same DNA.

Next, the State questioned Plopper regarding the comparison of DNA samples,

and Plopper testified in relevant part as follows:

> Q. And is it possible to take DNA from a biological material and compare it to a sample taken from a suspect and make a comparison of the two?

> A. Yes, it is.

> Q. Okay. And what would this comparison tell us?

> A. The DNA profile that we get just basically looks like a bunch of numbers on paper. What we're actually looking at are called STRs. STRs are short tandem repeats. They are going to be patterns in the DNA that repeat over and over again, alongside each other. And every single one of us has these repeats that we differ in how many repeats we have at a location. So whereas at one location, I might have nine repeats, you may have that pattern repeat ten times or 11 times, but we all have repeats there.

> So what we're looking at with a profile are -- the numbers that we see in the profile correspond to these repeats and at every location we're comparing the unknown to the known and seeing if those numbers are exactly the same between the profiles. And if they are, then that person can't be excluded of a possible contributor of that DNA.

> Q. Okay. Does one person's DNA differ from another person's DNA?

> A. Yes, with the exception of identical twins.

> Q. Okay. And does a person's DNA change at any time during their lifetime?

39

A. Typically, no.

Next, the State questioned Plopper regarding her examination of the specific DNA evidence at issue in this case, which included the DNA on the victim's clothing (i.e., a shirt, a pair of shorts, and a pair of underwear) and the sample swabs taken from appellant. Plopper testified that she examined the pair of shorts, but she "didn't do any testing on the shorts." She "did testing on the underwear." Based on her understanding of the case, Plopper determined that "it would be most likely [for her to discover] contact DNA from skin contact [between appellant and] . . . the underwear." She "took a sterile scalpel blade and scraped the material on the inside of the underwear." And then she "used a portion of those scrapings for the DNA testing." The State's attorney showed Plopper State's Exhibit 14 and asked her to identify it, which she did as follows: "State's Exhibit 14 is an envelope containing some of the scrapings that I took from the underwear. I only used half of the scrapings that I made for the extraction of DNA and saved half for any additional testing that would be required later on." State's Exhibit 14 was admitted without objection.

Plopper then testified regarding what she did next and how she conducted the process of DNA profiling and comparison:

> Once I collected the scrapings, I went through the DNA testing process and that involved placing the scraping into a small plastic tube and then going through a DNA extraction in which we add chemicals and heat to the sample. Since our DNA is stored in our cells, then the chemicals and heat allow the cells to be broken down so that we can release the DNA from the cells and also break down other parts of the cells and we're just left with DNA.
>
> Then the next step after that is quantification to determine how much human DNA was there and also, how much male DNA was there.

40

And the next step after that is called amplification. That's where we're able to target specific regions on a DNA that we know differ between people. Those are the STR locations I talked about earlier.

And the final step after that is to place part of the sample on to an instrument that's highly sensitive and that's hooked up to a computer with software that's going to take the information from the sample and from the instrument and let us visualize the DNA profile.

We go through all of that with the unknown sample before we test the known sample and repeat the process with the known, and then we'll have a profile from both the unknown and the known to compare.

Plopper testified that she followed the foregoing process in this case and was able to compare the scrapings from the victim's underwear with the buccal swabs taken from appellant. Plopper testified that she first had "to obtain a partial male Y STR profile" from the underwear scrapings. After that, she was able to compare the profile with appellant's profile. Plopper testified that she prepared a report with her findings in it. The report, which was marked as State's Exhibit 16, was admitted without objection. In the report, Plopper concluded that appellant or any patrilineal relative of appellant cannot be excluded as a possible contributor of the major Y STR profile obtained from the underwear scrapings. According to Plopper, "that means that not only could [appellant] . . . not be excluded any -- his father couldn't be excluded or if he had a son or any brothers or uncles, anyone in that same male line wouldn't be excluded either." Plopper then testified as follows:

Since . . . [appellant] couldn't be excluded, we wanted to see how often we would expect that profile to occur in the population, and so there's a database that's been developed for the U.S. that contains population data for Caucasians, African Americans, Asians, [N]ative Americans and Hispanics. And there -- at the time of this report, there were over 18,000 male individuals unrelated that are in this database.

And so, I was able to go to the web site and into the profile that I obtained from the scrapings of the underwear and see if that profile has been seen

41

in any of those males in that database. And it has been and these -- and I have numbers in this report that indicate how often it was seen in that database. . . .

[T]he frequency would fall within this particular range and it would not exceed .278 percent for African American, Caucasian and the Hispanic population, which is about 1 in 360 individuals.

The State concluded its direct examination of Plopper with the following exchange regarding the probability that the male DNA found in the victim's underwear came from appellant:

Q. Okay. So based upon your testing, is there a very high -- what's the probability that the DNA, the male DNA contained on the underwear belonged to . . . [appellant]?

A. All I could say with that is that I would only expect about 1 in 360 individuals in the Caucasian, African American or Hispanic population to have that same profile.

On cross-examination by appellant's trial counsel, Plopper was asked "about how easy it is for DNA to be transferred from different items to different items." Plopper testified in relevant part as follows:

Q. Does DNA only transfer from a person to an object or can it transfer from an object to another object?

A. I think it's most likely to transfer from a person to an object, but I can't say that absolutely it wouldn't, you know, occur between two objects, especially if there was a lot of friction applied between them.

Appellant's trial counsel then questioned Plopper regarding the victim's clothes and how they were collected and handled:

Q. Do you know that this clothing was packaged together, the shorts, the shirt and the underwear were all put in a -- in one particular package and delivered to the sheriff's department?

A. Yeah. I'm not aware of how it was before I received it.

Q. That's not ideal, is it?

42

A. It's not uncommon to receive clothing items in a package together, as long as they have all been selected from the same person that was wearing them. We see that in many cases.

Q. Do you remember my question? It was: That's not ideal, right?

A. I think that if -- if these clothing were all worn at once, then it's all been in contact anyway, but yeah, it definitely doesn't hurt to package things all separately because while they are in the bag together, they --

Q. Let me --

A. -- all have made contact with each other, so DNA could transfer.

Q. You're not going to sit here and tell this jury, like you wouldn't tell a room of people that know how DNA really works, that it's even remotely proper to put different samples together and allow them to interact with one another, are you?

A. I would say that we would not want the clothing and the swabs to be packaged together. But having these clothing all -- if they are all from the same individual, all worn, it's not quite the same as packaging them with a reference sample, but we definitely keep all of our unknowns and our references separate.

Counsel then shifted the focus of his cross-examination to the possibility of cross-contamination in this case, eliciting the following testimony from Plopper:

Q. Well, if this -- if this young lady was sleeping in the same bed at different times than Mr. Windham was and that clothes was making contact with the same sheets that he slept on, there could be cross-contamination, correct?

A. If Mr. Windham's DNA was on the sheets, it is possible it could have transferred to her clothing.

. . . .

Q. If Mr. Windham and she sat in the same chair, the same couch, and he's -- part of his DNA transferred to that chair or couch and then she sat down and a part of her clothing or her came into contact with where he was sitting, there could be cross-contamination there, correct?

A. There could be DNA transfer.

43

Q. Okay. Did you know that these samples were not collected for like two days after this alleged incident?

A. No, I did not.

Q. Okay. And that's not ideal, is it?

A. It depends on how the clothing was kept in the time between --

Q. Well, assume she may --

A. -- then and when it was collected.

Q. -- assume she wore it, laid on the same bed, same chairs in a house where they all lived and resided. There's multiple chances for cross contamination, correct?

A. The more her clothing would be in contact with other items that could have other people's DNA, that would -- over time, the DNA is cumulative so you can keep getting more and more on the same item . . . .

Q. Okay. Well, if they are all in the same house, all sitting in the same chairs, all sleeping on the same bed at different times, there's plenty of chances for cross-contamination, correct?

A. It is possible there could be DNA on the items, yes.

Appellant's trial counsel then cross-examined Plopper on the statistical figures she quoted earlier during her testimony on direct examination:

Q. And all these mathematical figures you want to use and percentages you want to use and decimals to the .28 percent, there's percentage chances that this stuff can come into contact and be cross-contaminated the more contact it has with different things that the same people are on, correct?

A. I can't say how the DNA got there, other than it is there and that I'm primarily getting just one male profile. I'm not getting a mixture of multiple individuals, one STR type.

Appellant's trial counsel then attempted to develop a basis for the jury to reject

Plopper's testimony by calling into question the manner in which she had been "handling

[the] DNA material." Plopper testified that in the laboratory where she works, they "use

44

gloves -- gloves that are kept in a box." Counsel elicited the following testimony in support of his theory that Plopper had mishandled the DNA samples in this case and caused cross-contamination:

> Q. So you don't use separately sterilized or sterily-wrapped (sic) gloves when you handle this stuff?
>
> A. No.
>
> Q. Okay. If the deputy came in here and testified and said that whenever dealing with evidence for DNA, their kit comes with sterile gloves, do you -- do you think that's better or do you think your process of just using a boxed glove where everybody can touch them and feel them is more appropriate?
>
> A. Sterile gloves, obviously -- you know there's not going to be any DNA there, but with our box of gloves, only really about -- we only touch the one glove on top that -- you're not -- you're not digging around in the box. You pull the one glove off and then use the gloved hand to draw the next one up, so we're not really handling them; and we change gloves very frequently throughout the testing process.
>
> . . . .
>
> Q. And what you're doing is pretty delicate, too, correct?
>
> A. Yes.
>
> Q. And handling those buccal swabs with gloves and then turning around and touching the evidence, there could be cross contamination there, too, couldn't there?
>
> A. Well, we are never testing the unknown items with the buccal swab because they're not even -- it wasn't even done on the same day.
>
> Q. Is it possible that you could handle the buccal swab and then use the same pair of gloves while you handled the testing --
>
> A. No, it is not.
>
> Q. -- of the item of clothing? Do you get this glove from the same box where you reached in to get the gloves when you handled the buccal swab?

45

A. Testing on the unknown items was done from beginning to end up to the point of getting the profile before the buccal swab was ever tested at all . . . .

Finally, appellant's trial counsel concluded his cross-examination by eliciting the following testimony about Plopper's failure to test the shirt and shorts that were submitted to her laboratory along with the underwear:

Q. And you didn't check to see if there was any DNA sampling on the shirt?

A. I honestly -- I discussed with Deputy Shiver before testing that the underwear would be the most probative item to test, so I didn't test the shirt.

Q. So without going into what you and Mr. Shiver talked about, you didn't test the shorts either -- that's a "yes" or "no" question -- correct?

A. No.

Q. And you don't know whether that shirt was covered with DNA from laying around on the same chairs or laying in the same bed if she slept in the same bed?

A. I didn't test the shirt so I don't know what DNA would be on it.

Q. Shorts either?

A. Or the shorts.

Q. And you're not saying or it is possible, correct, for those items to have transferred samples in this process of being all thrown into one bag and sent to the sheriff's office?

A. It's possible, but I would expect a low level of DNA.

On re-direct examination, the State's attorney asked only one question: "The place that you obtained the scrapings where you got the DNA, was that on the inside of the underwear or the outside underwear?" Plopper answered, "I scraped the inside of the underwear." The State then rested.

46

Appellant's trial counsel moved for an instructed verdict. The trial court denied the request. Appellant's trial counsel then requested that the trial court include in the jury charge the lesser included offense of indecency with a child. The trial court granted the request, stating, "And we've attempted to include that in there." The trial court then asked if appellant's counsel was objecting to the portion of the proposed charge "concerning evidence of wrongful acts possibly committed by the defendant . . . ." The State had no objection to the trial court removing that portion of the proposed charge, and the trial court removed it. Appellant's trial counsel then objected to the definition of "penetration" included in the proposed charge, which read in relevant part, "You are instructed that penetration is complete however slight." Appellant's trial counsel told the court, "I object to that definition. That definition is not included anywhere in the statutes, the case law. It lessens the burden of the State." Appellant's trial counsel continued, "I object to it as a comment on the weight of the evidence and respectfully request the Court to remove any new definitions of penetration, especially." The trial court overruled the objection:

> All right. And the reason why that is included in there is, I don't think it's any kind of a comment on the evidence or the weight of the evidence; I believe the case law does define or instruct that penetration is any penetration, regardless of how slight it is and it's included -- the reason I have it in there is so that the jury doesn't sit back there and have a long, drawn out-discussion of what is penetration, a quarter of an inch, half an inch, two inches or what.

That concluded the charge conference.

The jury was brought back into the courtroom. The defense rested, and the closing arguments commenced. After the State argued, the defense argued, at which point, appellant's trial counsel brought up the subject of the DNA evidence as follows:

> This is a serious, serious deal and I want to tell you something: About the time I got into law school, DNA was just becoming something to be

47

recognized. And it's relatively new, but I want to tell you something, it's a wonderful science, but I also want to tell you this, that this is the absolute worst case of cross-contamination I have ever seen. This is a joke for them to come up here and try to pull the wool over you and get you to believe that these clothes that were all intermingled around for two days, that was slept on on the same bed that Mr. Windham slept on, could not be cross-contaminated. Do not be hoodwinked by that. I'm telling you, that girl [referring to Plopper] wouldn't get up in front of a bunch of her peers and say what she told you. She would be laughed out of a room or a conference by not being more honest with you and saying, yes, sir, there's serious issues of cross-contamination.

I want to tell you something, Deputy Shiver, I bet he doesn't have near the degrees that this young lady has, but he knew it and he was honest with you and he told you, yes, that's cross-contamination. No, we don't like it like that.

Deputy Harris said no, we don't like it like that. He had problems with it. Those two officers knew more and were more honest with you about cross-contamination than this lady. And don't believe that it's not possible for you to get DNA off that chair, her DNA. It's very possible, extremely possible.

The gloves, they wouldn't have those rules like the deputies knew about, that she didn't know about it. I question her lab and the way they do business if they're not using sterile gloves, when you got people's lives on the line.

Appellant's trial counsel then concluded his closing as follows:

We talked about what it means to . . . have a reasonable doubt. I have a reasonable doubt about the touching issue. I have a reasonable doubt [about] whether or not somebody could have been coached or could have been talked to to say that. Okay. I have a problem with that. I feel like when you sit here and you listen and you -- like you have to [consider] this evidence and you apply the law that Judge Kraemer has given you, that if there is an offense that results as a result of this, it's this lesser included offense. And you can read what it says in here, but I want you to really concentrate and read what it says about sexual contact and see if that's not easier to walk away and not have a reasonable doubt.

The State then argued in rebuttal. After the arguments were concluded, the case was submitted to the jury, which on April 11, 2013, returned a verdict finding appellant guilty as charged. Appellant had previously filed his election for the trial court to assess

48

punishment in the event of conviction. At the commencement of the punishment phase of trial, which was conducted on September 27, 2013, the State reminded the trial court that it "had filed a notice of intent to enhance punishment" and that the State "allege[d] that prior to the commission of the offense . . . [in this cause], the Defendant was convicted of driving while intoxicated, a third degree felony." Appellant entered a plea of true to the enhancement allegation. The State then offered evidence of the prior conviction, which was admitted without objection.

Next, the State called Jade Bracewell to testify. On direct examination, Bracewell testified that he is "a probation officer with the 12th and 278th Judicial District[s]." Bracewell testified that upon the trial court's request, he had prepared a presentence investigation report on appellant, which was admitted into evidence over appellant's hearsay objection. Bracewell then testified that he had interviewed appellant while conducting his investigation. He testified that appellant "has had an ongoing battle with alcohol abuse for most of his life." According to Bracewell, appellant never alleged "that when he was growing up . . . he had been abused in any way . . . ." Appellant has not been treated for mental retardation. Bracewell testified that appellant is "not eligible for probation in this case due to his prior felony conviction."

On cross-examination, Bracewell testified that appellant cooperated with him during the interview and that he was "pleasant." Bracewell also testified that "this is the first time . . . [appellant has] ever been charged with anything other than an alcohol-related offense" and that "[t]here is no prior history of any type of conduct anywhere close to what he was convicted of [in this case]."

49

The State rested. Appellant's trial counsel then called appellant's daughter, Chrystal Heustis, to testify. She testified that she has a "very good" relationship with appellant, that she "love[s] him a lot, he's a very good dad." She admitted, "There was a time where he wasn't . . . . He's had some issues with alcohol . . . ." She "sat here through the whole case." She testified that she understood "that during the time that this alleged offense happened, . . . [appellant] was very, extremely intoxicated . . . ." According to her testimony, "There was 12 years where he went sober." She believed that the trial court "should look at the lighter side of the sentence range as opposed to the more serious . . . ." She testified that appellant has three other children, five grandchildren, and that she has no fear "at all" that he would harm any of . . . [her] children . . . ." She testified that the trial court "should consider a sentence towards the lighter end of the range so that . . . [appellant] can have some sort of ability to see the families grow up . . . ."

Appellant's trial counsel then called Margaret Wilson to testify. She testified that she is appellant's "big sister . . . [and] the second mom to him in some ways . . . ." She has had "close contact" with appellant "throughout the years." She was present throughout the trial. She testified, "This just doesn't sound like Chris at all." She told the trial court, "Please don't let him get 15 to 99. . . . [H]e's 60 and that would do him in." She admitted that he has "a drinking problem," which according to her, is "what's got him in the whole mess," referring ostensibly to the offense of aggravated sexual assault of a child. However, she testified that "short of that drinking problem, he had a great work ethic . . . ." On cross-examination, the State's attorney asked Wilson, "When y'all were growing up, was there any kind of dramatic event in Chris's life that turned him to alcohol?"

50

Wilson answered, "[N]othing that I can think of." He "was never physically abused at the house" or "sexually abused growing up."

After the State concluded its cross-examination, the defense rested and the parties made their closing arguments. The State asked the trial court to "consider a range around 25 years in the penitentiary." Appellant's trial counsel asked the trial court "to consider a sentence of no more than 15 years." At the conclusion of the hearing, the trial court imposed a twenty year prison sentence in open court. Also on September 27, 2013, the trial court entered its judgment of conviction by jury.

On October 23, 2013, appellant, still acting by and through his court-appointed trial counsel filed a motion for new trial. *See* TEX. R. APP. P. 21 ("New Trials in Criminal Cases"). Appellant requested a new trial on the basis that the verdict in this cause is contrary to the law and the evidence and on the basis that the trial court had committed an error in refusing to grant appellant's motion for instructed verdict. Appellant maintained that he was entitled to an instructed verdict on the basis that there was no evidence (1) that appellant was the defendant identified in the indictment, (2) that the alleged offense took place on or about March 2, 2012, or (3) that appellant caused penetration of the sexual organ of the victim knowingly or recklessly. Appellant requested that the trial court set his motion for new trial for a hearing to be held on December 2, 2013.

On October 31, 2013, appellant, now acting through retained counsel, filed a second motion for new trial. As grounds for relief, appellant argued that the jury's verdict is contrary to the law and the evidence and that he received ineffective assistance of counsel at trial. Appellant argued that his trial counsel's performance was deficient in the following respects: (1) failure "to adequately investigate the facts of the case to prepare

for trial"; (2) failure to "request the assistance of an investigator"; (3) "[f]ailure to object[] to State [e]xpert [w]itnesses"; (4) failure to seek "appointment of an expert witness to assist the defense in cross-examination of the State's experts or as a testifying expert"; (5) failure "to request notice of the State's intent to offer evidence of other crimes, wrongs, or bad acts pursuant to Rule of Evidence 404(b)"; (6) failure "to request notice of the State's intent to offer evidence of other crimes, wrongs, or bad acts pursuant to Rule of Evidence 609(f)"; (7) failure "to request notice of the State's intent to offer evidence of other crimes, wrongs, or bad acts pursuant to Article 37.07 of the Code of Criminal Procedure"; and (8) failure to "interview any family members to investigate issues which could be used in the event of a punishment hearing." According to appellant, each of the foregoing deficiencies in trial counsel's performance, individually and in combination, prejudiced appellant's defense:

> The failure to investigate facts prevented effective cross examination of the State's witnesses and to present defense witnesses. The absence of defense experts prevented effective challenges to the State's expert witness evidence. The failure to request notice from the State permitted the admission of evidence which may have been excluded.

Appellant requested that the trial court set the motion for hearing before December 10, 2013 to allow appellant "to develop a record on whether the failure[s] of his trial counsel . . . [were] strategic . . . ."

On December 2, 2013, the trial court held a hearing on appellant's motion for new trial. Appellant appeared through his retained counsel and waived his right to appear personally before the court for purposes of the hearing. Appellant's counsel called three witnesses to testify: (1) appellant's sister, Wilson; (2) appellant's daughter, Heustis; and (3) appellant's court-appointed trial counsel. They testified in relevant part as follows.

52

On direct examination, appellant's sister testified that she took appellant to trial counsel's office to try to visit about the case "[m]aybe two times" before trial, that trial counsel did not meet with appellant on those occasions, that she was present with appellant when he tried to call trial counsel by telephone "several times" before trial, that those attempts were unsuccessful, and that trial counsel did not visit with her until "the presentencing." On cross-examination, appellant's sister testified that she was not present on the day this offense was alleged to have occurred and that she has no personal knowledge about the facts concerning the underlying case. She testified that she believed trial counsel had visited with appellant once when appellant was in jail before sentencing and that she did not know if there were any other meetings.

Next, appellant called his daughter to testify. On direct examination, appellant's daughter testified that while the charge was pending trial, appellant stayed with her for roughly one week. She testified that during that time, appellant made one unsuccessful attempt to contact trial counsel by telephone. She also testified that she was willing to testify at trial, but she was not called to testify during the guilt/innocence phase of trial. According to her testimony, appellant's trial counsel met with her on the morning of the punishment hearing before he called her as a witness for appellant. On cross-examination, appellant's daughter testified that she was not present on March 2, 2012, when the offense occurred. She admitted that she had no personal knowledge about anything in the guilt/innocence phase of trial. She also confirmed that prior to the actual trial date, appellant had come to the trial court several times for hearings and that she had seen appellant conversing "[a] little bit" at "the table here" with his trial counsel. On

re-direct examination, she clarified that she "didn't see any in-depth conversations on any of those times."

Finally, appellant called his court-appointed trial counsel to testify. On direct examination, appellant's retained counsel asked trial counsel a number of questions regarding the different allegations of deficient performance raised as grounds for relief in appellant's second motion for new trial. Trial counsel confirmed that he did not request an investigator. He gave the following explanation for why he did not request an investigator:

> Well, it was a case involving an eyewitness who claimed to have walked in and caught Mr. Windham involved in an aggravated sexual assault and there was also a small child involved that had made an outcry, so . . . [I] was more concerned with what the witness, the adult witness was going to say and what the child victim was going to say.

Trial counsel admitted that he did not interview the adult witness. He testified that he "read the statement." He admitted that he "was relying upon what the witness and the offense report had to say and the statements taken at the scene."

Trial counsel testified that he was aware that the State intended to introduce expert witnesses and that the case "very marginally" involved DNA. According to trial counsel, "[t]here was some testimony about whether or not . . . [appellant's] DNA was on some blankets or something." Then, the following exchange occurred:

> Q. And was there also testimony about whether or not there was a mixture of another male's DNA?

> A. As I recall, there was -- there was questions of it being other -- Mr. Windham lived in the house and there was more than one sample of DNA on the blanket or cover, whatever it was.

> Q. And you determined that it was not or would not have been helpful to Mr. Windham to have a defense expert to seek to rebut or undermine that DNA evidence?

54

A. Well, I was more concerned about, was the lady who walked in and claimed she saw him in the act of some improper involvement with the child, eyewitness testimony, I was way more concerned with.

Q. Okay. So is that basically a no with regard to --

A. No. It's a -- I was way more concerned with what an eyewitness who claimed to have walked in and observed something than I was with DNA testimony.

Thereafter, appellant's trial counsel testified regarding the child victim as follows:

Q. Was there any evidence, not simply at trial, but were you aware of any allegations or evidence of conduct by the alleged victim with other people?

A. I had been told some things by the defendant that -- at different times that contradicted things from time to time when we talked.

Q. And did you seek to investigate those -- that information from the defendant?

A. I visited in-depth with the defendant about what the allegations were by the eyewitness, what I thought that the child victim was going to say and those were where I was really concerned.

Q. But you did not independently investigate the information he provided to you about the victim's conduct -- other conduct?

A. Okay. This was a very young child and again, I did not investigate a way to rewrite the law to put in the child's prior bad behavior or anything like that.

. . . .

[Q.] Are you aware that Rule of Evidence 412(b) specifically allows evidence of specific instances of prior conduct, if it is offered, to address or rebut scientific or medical evidence?

A. I am aware of that.

Q. So there was an avenue that you could have used to present evidence of other conduct of the victim, once there was evidence of a mixture of DNA?

A. Okay. Again, if this had been a case where it was Mr. Windham's DNA on a blanket, other people's DNA on a blanket, that may have been a viable decision. In this case, there was an adult eyewitness that walked in and

caught Mr. Windham in an illegal act and there was a child that made an outcry following that, and I did not see that the DNA was going to do anything that opened doors that would be confusing, would require Mr. Windham to testify. And I still say, when you have an eyewitness adult testifying to have visually seen the criminal act happening, that is what really concerned me.

Q. And did you make a determination that you -- that the evidence of who may have initiated any contact would not have been beneficial at a punishment phase?

A. I believe that what I was told was not going to help at the punishment phase. I wanted to focus more on the defendant's age, his ability to get out as soon as possible and to be with his family because of his age and to keep him from getting up to 99 years in this case.

Q. And you made that decision regarding your strategy before conducting an investigation into those areas?

A. I think that a court or a jury would find testimony of a very young child coming on to someone and that person or adult not leaving the scene could have back fired and been detrimental to Mr. Windham.

Q. And was that exclusively your decision or was that Mr. Windham's decision?

A. I talked with Mr. Windham and said there's certain things you need to realize whether we need to focus on, whether or not you, at your age, were in control of this situation, the victim was in control of the situation, who has the duty to stop, who has a duty to retreat, and that's an area that I strongly advise you not to go down and he agreed with me.

Q. And who made the decision with regard to his [not] testifying at trial?

A. He did.

After discussing the child victim, trial counsel testified on direct examination regarding requests for notices under Rules 404(b) and 609 of the Texas Rules of Evidence and Article 37.07 of the Texas Code of Criminal Procedure, stating that he did not "recall" why he did not file such notices. Then, the following exchange occurred:

56

Q. And you're aware that under Rule 404(b), that the Court has no power to trigger that rule, it's a request by the defendant that triggers that notice obligation?

A. I know that the Court in -- requires that the State provide what we're entitled to and it was complied with very early on; and I believe there was some supplements but I can't recall what the -- I mean, I remember they filed a notice of the extraneous offenses, that they intended to use for enhancement later on. I don't recall exactly what all was filed. I'd have to go pull the file and look at it.

Finally, on direct examination, trial counsel testified regarding "the standing discovery order" as follows:

Q. You talked about the standing discovery order. In this case, do you recall that the Court had a scheduling order that required the State to disclose expert witnesses by July 9th, 2012?

A. I don't recall, I'm sure it's in there.

Q. And do you recall the date that the State gave notice of their expert witnesses?

A. I do not recall.

Q. Will you -- does it sound like July 20th would be a correct date?

A. I have no way of knowing. I'd have to go look.

Q. Do you recall whether you made any objections to the State's expert witnesses at trial?

A. I believe we did, but I'm not sure.

Q. Would it have been on the basis of failure to timely disclose?

A. I don't -- don't recall if it did or not.

After trial counsel gave the foregoing testimony, the State cross-examined him. One of the first subjects the State raised was the significance of the DNA evidence in this case. The following exchange occurred on cross-examination:

Q. Now, if you recall the testimony at the time of the trial, was it a fact that Mr. Windham had actually been residing in the residence where this took place for some amount of time?

A. There was testimony that he was living at the house where the victim lived.

Q. Okay. And so under those circumstances, you would expect to find his DNA in that residence, would you not?

A. I believe -- I believe I recall testimony or evidence that he slept on the couch and this blanket was on that couch.

Q. Okay. And I believe there was also testimony that there were other people that resided in the house other than Mr. Windham and the victim?

A. There were -- there were quite a few people in the house.

The State also cross-examined trial counsel regarding his visits with appellant. Trial counsel testified that he met with appellant "[b]efore the trial actually began, one, two, three, four, five, six, seven, eight, nine times." Trial counsel also testified that he met with appellant "several times after trial."

On cross-examination, the State asked trial counsel about his reasons for not requesting an investigator, and counsel testified in relevant part as follows:

Q. Did you think that it was necessary for an investigator [to be hired or appointed] in this case?

A. No, I did not. Well, this case involved an eyewitness. There were statements, there was a detailed report and I did not think that these witnesses would talk to me, I did not think that they would talk to an investigator. And my experience has been that the investigators that I've used in the past, they don't do as thorough a job or -- they just don't seem to help when it comes to interviewing witnesses.

The statements that I received were very detailed and the statements from the other people there, they were not contradictory and I did not think that -- I wasn't about to contact the child myself and -- or have someone contact the child, but I just -- I had more than enough information to [know] what I thought that person's testimony would be and what their evidence they would offer at the time of trial [would be].

58

Q. Is it fair to say that the majority of the testimony, outside of the DNA testimony, concerned testimony from the – Shena [Willaims], the lady that -- from whom they were leasing the house or residing in the house and the victim themself and the victim's mother?

A. Yes, that's true.

Q. And based upon your experience that you have had in the past, do those type of witnesses tend to want to talk to the defense attorney?

A. I know some of those individuals and I do not think that I would have had very much luck with them, I just don't -- I think they see me as some kind of a villain for representing Chris in this case.

Finally, on re-direct examination, appellant asked his trial counsel about his reasons for not attempting to interview witnesses, and trial counsel testified in relevant part as follows:

I don't think that in a child case like this, sexual assault, that the victim or anybody associated with the victim will have anything to do with the criminal defense lawyer representing the defendant; and that's a -- kind of a -- in any one of these type cases, and unfortunately, I've represented several of these kind of defendants, and I've never been able to get to first base because they look at you the same way they look at the defendant.

The trial court then heard the parties' closing arguments. Appellant argued as follows:

Your Honor, I'm always hesitant, of course, to raise an ineffective assistance claim, for a number of reasons. We have now the State Bar's guidelines and standards for appointing counsel and they set some requirements and that's a baseline for us that we have to follow. And one of those, certainly, is investigating a case thoroughly, and that's an area of concern here.

It's almost impossible for us to show what would have been able to be presented had an investigation been thorough and independent. And one of the emphasis of those standards are that the investigation be independent from the State's investigation.

Now, we certainly understand [defense counsel's] concern about being able to successfully talk to the complainant or the witness, and that's one of the

59

reasons that investigators are available and there's a right to ask for, under *Ake*, the State to provide funds for the defense investigator.

As set out in our motion, we believe that Mr. Windham is entitled to a new trial because the pretrial investigation did not meet the standards that the law sets for criminal cases with regard to, primarily, the pretrial investigation. We don't have the full record so I cannot identify evidence that was introduced that would have been excludable, had the notices been filed. And that's probably the argument we may have to make down the road. But we certainly ask for the Court to grant our motion for new trial granting a new trial to Mr. Windham.

In response, the State argued in relevant part as follows:

Most of the arguments that he's making, [defense counsel] . . . has successfully defended his position, most of it on the fact that due to his experience, that in most of these type of cases that the people won't speak to him or defense attorneys and that he felt that this was an eyewitness case, that most of the case involved the lady who owned the house, the victim herself and the victim's mother.

Based upon the demeanor at the time of the trial of how those individuals acted in the trial, I think it would be fair to say that they would probably not have been very cooperative towards the defense in this case. And the Court can certainly recall the -- how the witnesses acted at the time of the trial, based upon how they acted in response to [defense counsel's] . . . questions.

Most of the arguments that were made today were based upon whether or not his actions were appropriate or inappropriate, but most of the arguments that were made are -- kind of fallen within the purview of trial strategy. In addition, a lot of the arguments that he made regarding the notices, it's clear that he was not prejudiced in any way. We provided all the notices to [defense counsel] . . . , even despite his request to -- his failure to ask for such notices, we gave them anyway. He said that he had plenty of time to prepare for trial. The note that the lack of notices or lack of -- the information that we had -- provided by the State provided him adequate notice to prepare for trial. So we would ask that you deny the motion for new trial.

In rebuttal, appellant's argued as follows:

Your Honor, this is -- the motion for new trial procedure is the opportunity for the State to avoid an appeal, having a new trial a year down the road after an appellate court rules where we have to do a habeas corpus proceeding. And much of the argument with regard to what may or may not have been presented is necessarily indefinite at this point. We don't know

how things would have gone and that's the purpose of a new trial, to not require Mr. Windham to suffer the risk of that uncertainty to have a fair procedure. And that's the basis for our request for a motion for new trial.

Thereafter, the trial court denied appellant's motion for new trial without entering any findings of fact or conclusions of law. The trial court did not state the basis for its ruling. Appellant subsequently appealed his conviction, and the appeal was transferred from the Waco Court of Appeals to this Court by a docket equalization order.

## IV. DISCUSSION

Appellant has identified fourteen purported deficiencies in his trial counsel's performance at trial. Specifically, appellant asserts that counsel's performance was unreasonably deficient because counsel (1) "failed to conduct *any* independent investigation of the facts of the case"; (2) "did not have a firm command of the facts"; (3) "affirmatively misunderstood key facts"; (4) failed "to [c]onduct [a] [t]imely [i]nterview of [a]ppellant"; (5) failed to obtain "the assistance of an investigator to conduct interviews"; (6) "repeatedly asserted . . . [the] fundamentally mistaken understanding that there was an adult eyewitness to the offense"; (7) "failed to investigate the information provided by [a]ppellant regarding conduct of the complainant with others"; (8) failed "to obtain a defense expert to discuss the mixture of male DNA [on the child victim's underwear]"; (9) failed "to seek to interview any of the State's witnesses"; (10) "failed to interview the only two witnesses he called at the punishment phase of trial until *after* [a]ppellant was convicted"; (11) "failed to raise potential additional issues concerning the reliability and probative value of the DNA evidence"; (12) failed "to obtain the assistance of an expert to meet the prosecution expert's testimony"; (13) "failed to object to [evidence of] several

61

extraneous offenses"; and (14) "failed to object to opinion evidence about the truthfulness of another witness."

As we noted at the outset of the opinion, even if we were to conclude that trial counsel's performance fell below an objective standard of reasonableness in one or more of the foregoing respects alleged by appellant, we would face the second prong of the *Strickland* test for ineffective assistance of counsel at trial, which asks the fundamental question regarding the totality of the representation: did counsel's deficient performance prejudice the defense? *See Lopez*, 343 S.W.3d at 142. Did counsel's performance undermine the proper functioning of the adversarial process? *See Villa*, 417 S.W.3d at 463. Did the trial produce a reliable result? *See id*. Do the deficiencies in counsel's performance undermine our confidence in the outcome of the proceeding? *See Lopez*, 343 S.W.3d at 142. Is there a reasonable probability that the result would have been different but for counsel's performance? *See id*.

In *Strickland*, the Court observed that "there is no reason for a court deciding an ineffective assistance claim to approach the [two part] inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Moreover, "[t]he prudent jurist will typically decide cases on the narrowest, surest ground available, leaving tougher calls, with broader implications, for future cases that squarely present them." *Randolph v. State*, 353 S.W.3d 887, 895 n.32 (Tex. Crim. App. 2011) (quotations omitted). In this case, we believe the narrowest, surest ground available for deciding the appeal is the second prong of the *Strickland* test, the prejudice prong, particularly with respect to the alleged deficiencies in counsel's performance during the guilt/innocence phase of trial.

62

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The United States Supreme Court has recognized that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "In making the determination [under the second prong of the *Strickland* test regarding] whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* at 694.

Appellant has not challenged the sufficiency of the evidence to support the jury's verdict. Therefore, we presume that the judge and jury acted according to the law. *See id.* Under Texas law, a victim's uncorroborated testimony may support a conviction for aggravated sexual assault if, at the time of the alleged offense, the victim was seventeen years of age or younger. TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1) (West, Westlaw through 2013 3d C.S.). Thus, twelve-year-old Jane Doe's testimony, on its own, was a sufficient evidentiary basis for the jury to find appellant guilty as charged. *See id.* Even in the absence of every purportedly deficient aspect of trial counsel's performance in connection with the guilt/innocence phase of trial, the child victim's testimony would have remained in the record, providing sufficient evidence to support the jury's finding of guilt.

63

In this sense, the child victim's testimony assures this Court that the result of the proceeding would not have been different but for counsel's purportedly deficient performance. *See Lopez,* 343 S.W3d at 142.

All the other evidence and testimony presented during the guilt/innocence phase of trial went primarily to the issue of corroborating the child victim's testimony. As set forth above, appellant's trial counsel diligently sought to impeach, discredit, and contradict the State's witnesses and evidence offered in support of the child victim's testimony, including the following: (1) Williams' account of what she saw, which counsel addressed by attempting to impeach her credibility by eliciting testimony from Hanson that Williams' biological mother is presently incarcerated (presumably, for the murder of Williams' first stepfather) and that Hanson has custody of Williams' three children for unspecified reasons and by suggesting to the jury that Williams had a motive to give false testimony against appellant because there was discord between her and appellant, because she blamed appellant for the death of her first stepfather, and because appellant had forbidden her from using his truck; (2) J.R.'s testimony that it took about twenty minutes to travel from the trailer home to the store where she went to pick up the pizza on the date the offense occurred and about how the children's clothes were kept away from appellant, which counsel addressed by cross-examining J.R. and getting her to admit that the store was only five minutes away from the home by car and that the children's clothes were "laying on . . . [appellant's] bed" and "laying on whatever else he had in the room there"; (3) former Deputy Harris's testimony that he received the child victim's clothes on the date of the offense, which counsel addressed by cross-examining Harris and getting him to admit that he received the clothes "probably around 24 [hours later]," that there "was an

64

error on . . . [his] part," and that he could not "tell this Court who was in contact with that clothing or how many people came in contact . . . [with it]"; (4) Hanson's testimony regarding the outcry made to her by Jane Doe, which counsel addressed by making, and obtaining rulings on, timely objections to Hanson's status as an outcry witness and to her testimony being inadmissible hearsay; and (5) the DNA evidence, including Plopper's testimony that appellant could not be excluded as a contributor of the DNA found in the child victim's underwear, which counsel addressed by raising the issue of "cross-contamination" in his cross-examination of Plopper, Deputy Shiver, and former deputy Harris. All of trial counsel's efforts in the foregoing respects were calculated to undermine and discredit the State's case and to reduce the incriminating evidence against appellant to the uncorroborated testimony of the child victim. However, even the most zealous advocacy by trial counsel could not remove from the jury the authority to reach a guilty verdict based solely on the testimony of the child victim, whose account of the offense was full and complete. TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1).

None of the purported errors in trial counsel's performance could have had any effect on the nature and content of the child victim's testimony on direct examination. However, we recognize that counsel's purported errors could have affected his cross-examination of the child victim. Appellant argues that his trial counsel should have investigated the possibility that the child victim initiated the encounter with appellant and should have offered evidence of prior instances of sexual conduct by the child victim. Would this have given the jury a basis to reject the child victim's account of the offense that is so compelling that it undermines our confidence in the outcome of the trial? *See Lopez*, 343 S.W.3d at 142. The short answer is no.

65

As trial counsel testified at the hearing on appellant's motion for new trial, "I think that a court or a jury would find testimony of a very young child coming on to someone and that person or adult not leaving the scene could have back fired and been detrimental to . . . [appellant]." Furthermore, even if trial counsel had presented evidence that the child victim had initiated the encounter and that the child victim had other similar encounters in the past, the evidence of the criminal conduct that appellant was charged with in this case—the conduct set forth in the child victim's testimony on direct examination—would have remained unimpeached and free from contradiction. Specifically, there would still remain uncontroverted evidence that appellant knowingly penetrated the child victim's sexual organ with his finger and was therefore guilty of aggravated sexual assault of a child. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i). Accordingly, we conclude that appellant has failed to demonstrate a reasonable probability that the result of the guilt/innocence phase of trial would have been different but for counsel's performance. *Lopez*, 343 S.W.3d at 142.

We reach the same conclusion with respect to sentencing. Appellant asserts that his trial counsel's performance was deficient because counsel "failed to interview the only two witnesses he called at the punishment phase of trial until *after* [a]ppellant was convicted." The record confirms that trial counsel did not interview the two witnesses he called at the punishment phase of trial, appellant's daughter and sister, until after the jury returned its guilty verdict, but we reject appellant's contention that this amounted to ineffective assistance of counsel. The record does not demonstrate that these witnesses had any relevant testimony to offer during the guilt/innocence phase of trial. Furthermore, appellant's trial counsel had from April 11, 2013, when the jury returned its guilty verdict,

66

until September 27, 2013, when the trial court held the sentencing hearing, to prepare for the punishment phase of trial. Of course, appellant's trial counsel could not have been certain that there would be a punishment phase of trial until the jury returned its guilty verdict. Therefore, we conclude that appellant has not established that his trial counsel's performance fell below an objective standard of reasonableness in this regard. *See id.* Furthermore, the record does not support a conclusion that, if counsel had interviewed the two witnesses sooner, there is any probability that the outcome of the proceeding would have been different. *See id.*

Based on the foregoing, we conclude that appellant has not established reversible error with respect to his constitutional right to receive reasonably effective assistance of counsel at trial. *See* TEX. R. APP. P. 44.2(a). Furthermore, having reviewed the prejudice issue *de novo* under the test set forth in *Strickland*, we conclude that the trial court did not abuse its discretion by denying appellant's motion for new trial based on his assertion of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 693 (stating that "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice" because the "government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence"). Specifically, based on the facts set forth in the trial record, the trial court could have reasonably concluded that appellant failed to affirmatively prove a reasonable probability that the result of his trial would have been different but for counsel's purportedly deficient performance. *See Mitchell v. State*, 989 S.W.2d 747, 748 (Tex. Crim. App. 1999) ("The general federal constitutional rule is that a defendant claiming ineffective assistance of counsel must affirmatively prove prejudice

from counsel's deficient performance."). Accordingly, we overrule appellant's two issues in which he asserts that he is entitled to a new trial because he received ineffective assistance of counsel at trial.

## V. Conclusion

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
24th day of June, 2014.